# FRANK L. DINSMORE V. STATE OF NEBRASKA.

### FILED MARCH 6, 1901.  No. 11,470.

1. **Criminal Prosecution:** INFORMATION: CONSTITUTION: STATUTE. Chapter 54 of the Criminal Code, which authorizes the prosecution of criminal offenses by information, does not violate the rule of uniformity prescribed by section 19, article 6, of the constitution.

2. **Statute:** GENERAL OPERATION: INDICTMENT: INFORMATION. Said chapter 54 of the Criminal Code authorizes the filing of an information or indictment in each and every county in the state, and appplies to every county and to every district court, and hence is general in its operation, and not special.

3. ———: ———: ———: ———: CONSTITUTION. Said chapter 54 of the Criminal Code is not obnoxious to section 19, article 6, of the constitution merely because it permits the prosecution of one person by information and another by indictment in the same court.

4. **Discretion of Court:** UNIFORMITY OF STATUTE. The mere fact that a district court may elect whether a grand jury shall or shall not be called in any term of court does not make said chapter 54 lacking in uniformity.

5. **Proceedings and Practice:** UNIFORMITY. The proceedings and practice of the several district courts of the state are uniform, even though the prosecution in one case may be by information in one county, and in another case in another county by indictment, since, wherever the proceedings are by indictment, if it obtain in every county, the proceedings relating to indictments are uniform, and the same is likewise true if by information.

6. **Constitution:** INTENT OF FRAMERS. It was never contemplated by the framers of section 10, article 1, of the constitution, or by the people in adopting it, that the legislature must abolish the grand jury system entirely and permit criminal prosecutions by information only, but rather that the legislature might authorize prosecutions by either indictment or information, making the proceedings uniform in each method.

7. **Criminal Code:** CONSTITUTION: JUDICIAL DISCRETION: LEGISLATIVE POWER. Section 584 of the Criminal Code, which leaves to the discretion of any district court the determination of whether a grand jury shall be drawn, is not conferring upon the judicial branch of the state government legislative powers inhibited by section 1, article 2, of the constitution.

Dinsmore v. State.

8 Constitution: SPECIAL LEGISLATION. Section 584 of the Criminal Code is not special legislation within the purview of section 15, article 3, of the constitution.

9. Power of Legislature: ABOLITION OF AN OFFICE. The legislature has the power to abolish any office by it created.

10. District Attorney: NOT A CONSTITUTIONAL OFFICE. The office of district attorney was not created by the constitution, but by general law before the adoption of that instrument.

11. ———: OFFICE ABOLISHED. The office of district attorney has been abolished.

12. County Attorney: CREATION: LEGISLATURE: CONSTITUTIONAL POWER. The legislature had the constitutional power to create the office of county attorney.

13. Duty of County Attorney: It is the duty of a county attorney to file informations for crimes and to prosecute all criminal cases in his county.

14. Preliminary Examination: WAIVER. The objection that the defendant in a criminal case has not had a preliminary examination is waived unless raised before he enters a plea of not guilty.

15. Continuance: JUDICIAL DISCRETION. The granting or refusing of a continuance of a criminal cause, rests in the sound discretion of the court, and a ruling in that regard will not be disturbed on review, in the absence of a showing of an abuse of discretion.

16. Panel of Petit Jurors: SUMMONING: STATUTE. When, at any term of the district court, for any cause there is no panel of petit jurors, the court may, under section 664 of the Code of Civil Procedure, direct the sheriff to summon jurors.

17. ———: ———: ———: CONSTITUTION. Said section 664 of the Code of Civil Procedure is not inimical to section 19, article 6, of the constitution, as it does not violate the rule of uniformity therein prescribed.

18. Impaneling: EVIDENCE: BILL OF EXCEPTIONS. The evidence relative to the impaneling of a jury must be incorporated in the bill of exceptions and embraced in the certificate allowing and settling the bill, to entitle one to review the rulings of the court in denying a challenge for cause.

19. Record: VERITY: CONTRADICTION. Error can not be successfully predicated upon a ruling where the record is contradictory as to what the ruling was.

20. Challenge: JUDICIAL DISCRETION. The ruling of a trial court in deciding a challenge for cause will not be disturbed, unless an abuse of discretion is shown.

21. **Venireman: OPINION.** An opinion formed by a venireman in a criminal cause does not affect his competency, or afford cause for challenge, unless it is unqualified as to the guilt or innocence of the accused of the crime charged.

22. ――――: ――――: **NEWSPAPER REPORT.** An opinion formed solely on rumor and newspaper reports will not disqualify a juror, where it is shown that the opinion is merely hypothetical, and such as will not prevent his returning a fair and impartial verdict upon the evidence adduced on the trial, under the instructions of the court.

23. ――――: **CAPITAL PUNISHMENT: CONSCIENTIOUS SCRUPLES.** The entertaining of conscientious scruples against capital punishment is a ground for challenge for cause in a prosecution for murder in the first degree, and it is competent to interrogate a venireman upon that subject.

24. **Murder: SUICIDE: EXPERT TESTIMONY.** In a prosecution for murder, where the death of the victim was occasioned by a gunshot wound, the theory of the defense being suicide of deceased, it is competent for a physician, who has examined the body and the surroundings at the place where it was found, to testify as to the position in which the body must have lain for the blood to take the course from the wound it did.

25. **Leading Question: JUDICIAL DISCRETION.** The propounding of leading questions is within the discretion of the trial court.

26. **Admission of Testimony.** Rulings on the admission of testimony examined and approved.

27. **Instructions.** One can not successfully assail an instruction where one tendered by him has been given which is subject to the same criticism.

28. ――――. Before a party can complain of an instruction because not sufficiently specific, he must request an instruction covering the point.

..9. ――――. In a criminal prosecution the trial court may, in its discretion, give a cautionary instruction.

30. **Argument: CRITICISM OF DEFENDANT.** Counsel for the state in argument to the jury may criticise the conduct of the defendant as disclosed by the evidence, though such defendant was not a witness in his own behalf.

31. **Instruction: DESIGNATING DEFENDANT.** It is not erroneous to designate the defendant in such a case in an instruction as the "prisoner."

32. **Province of Jury: MERCY.** Questions of mercy are not for the

jury, but for the executive, in the exercise of the pardoning power, and it is not erroneous to so instruct the jury in a prosecution for murder.

ERROR from the district court for Dawson county. Tried below before SULLIVAN, J. *Affirmed.*

*Norris Brown, Thomas F. Hamer, Edward A. Cook* and *Francis G. Hamer,* for plaintiff in error:

The defendant below should have been prosecuted by indictment instead of by information.

The proceeding in this case was contrary to the general and uniform rule enjoined by the state constitution, section 19, article 6. Under the constitution, and in the nature of things, the power to determine whether prosecutions shall be by indictment or by information is legislative. A judicial functionary can not exercise legislative functions, nor can the legislature delegate such a power to it. The legislature and a judge may not do what the legislature is forbidden to do. The act in question is not uniform in its operation, and it is an attempt on the part of the legislature to delegate its power. Legislative functions may not be delegated to a court. *People v. Bennett,* 29 Mich., 451; *People v. Carpenter,* 24 N. Y., 86; *People v. Town of Nevada,* 6 Cal., 143; *People v. Cooper,* 83 Ill., 585.

A statute that can not be reduced to a general rule, to operate in all parts of the state alike, is not a general law. *King v. State,* 3 L. R. A. [Tenn.], 211.

The proceeding by information was in violation of articles 5 and 14 of the amendments to the United States constitution, as its successful termination would deprive the plaintiff in error of his life or liberty without due process of law.

No preliminary examination was had, the same being waived. A prisoner can consent to nothing during a trial; and he can not consent to waive what the law requires. *Queen v. Bertrand,* 1 L. R. P. C., 520; notes to *King v. State, supra,*

The cautionary instruction against mercy was errone-
ous.   If the plea for the defendant for the lighter pun-
ishment made the court fearful of the result, it was,
nevertheless, no part of his duty to enter the debate on
behalf of the state.   *Morris v. Lachman,* 68 Cal., 109;
*Hayes v. State,* 58 Ga., 35; *Thorp v. Goewey,* 85 Ill., 611;
Thompson, Trials, 2301.

*Constantine J. Smyth, Attorney General, Willis D. Old-
ham, Deputy,* and *Hector M. Sinclair, contra.*

NORVAL, C. J.

In the district court for Dawson county, to which
county the case had been taken on change of venue from
Buffalo county, Frank L. Dinsmore was convicted of
murder in the first degree and sentenced to be hanged,
from which conviction he comes to this court on error.
From the evidence of record it appears that for a year or
more prior to the homicide defendant had been boarding
at the home of one Fred Laue, in the little town of Odessa,
in Buffalo county, during which time improper relations
commenced between defendant and Mary Laue, wife of
said Fred Laue, which relations continued, with more
or less regularity, down to the time of the tragedy.   After
such relations commenced, Dinsmore married and
brought his wife to board at Laue's.   While they were
boarding there he proposed to Mrs. Laue that he kill his
wife and Laue, and so arrange their bodies as to make it
appear that Laue had murdered Mrs. Dinsmore and had
then committed suicide.   Mrs. Laue, the principal wit-
ness for the state, claims she would not assent to this,
but that she did, through fear of Dinsmore, remain silent
while Dinsmore accomplished his fell purpose.   The de-
tails of the act, that of "a fiend in the ordinary display
and development of his character," are not necessary to
an understanding of the errors alleged to have been com-
mitted by the trial court.   On an information charging
him with the murder of Laue, Dinsmore was convicted.

The errors argued will be noticed in the order of their presentation in the brief of defendant.

The provisions of the Criminal Code which permit prosecutions by either indictment or information are attacked by counsel for defendant as being in violation, among others, of section 19 of article 6 of the constitution, which is as follows: "All laws relating to courts shall be general, and of uniform operation, and the organization, jurisdiction, powers, proceedings, and practice of all courts of the same class or grade, so far as regulated by law and the force and effect of the proceedings, judgments, and decrees of such courts, severally, shall be uniform." It is urged that the statutes which authorize the prosecution of criminals by either information or by indictment, depending on the discretion conferred upon courts by section 584 of the Criminal Code relating to the calling of a grand jury, violate the rule of uniformity and generality prescribed in said section of the constitution. It is insisted that chapter 54 of the Criminal Code, which permits the filing of informations, is not general, because it admits of the filing of an information in one county and of an indictment in another county, while it should admit of the filing of one or the other in all counties, but not of both. The objection is not well grounded. The law permits the filing of either indictments or informations in any county in the state, and whether a prosecution shall be by indictment or by information depends upon whether a grand jury is or is not in session. The same law applies to every county in the state, and for that reason is general, and in no respect special. It is urged that it is not of uniform operation for this reason, and for the additional one that in the same court it permits an information to be filed in one case against a defendant and an indictment to be filed in another case, and all according to the whim or inclination of the judge. We think nothing depends upon the whim or inclination of the judge, but that it is left to the sound discretion of the court—

a very different thing. But does the mere fact that in
the same court a man may be prosecuted by either in-
formation or indictment detract from the uniformity of
the law? Does it not apply to every county in the state?
Is there a district court in the state which is confined by
law to the prosecution of crimes solely by information?
Is there any that must prosecute by indictment only?
If there be, then is the act lacking in uniformity. Is there
any district court in the state where, if prosecution be by
information, the procedure must be different from that in
other counties where prosecution is by information, or
where, if prosecution be by indictment, the procedure
is different there from that in other counties where prose-
cutions are by indictment? Then is the law lacking in
uniformity. But the mere fact that the court may elect
whether a person shall be prosecuted by indictment or
by information, as may seem best, renders the law not
at all lacking in uniformity. It is urged that the law
prevents the practice and proceedings from being uni-
form, because the prosecution may in one case be by
information and in another by indictment, and the prac-
tice may be to indict in one court and to proceed by in-
formation in another. Neither does this abate one jot
or tittle from the rule of uniformity formulated in the
constitution. Wherever the proceeding is by indictment,
if it obtain in every county in the state, the proceedings
and practice relating to indictment are uniform, and the
same is true if by information. There is no lack of uni-
formity in either case. It was not meant by this con-
stitutional provision that there should be but one method
whereby a legal right should be enforced or a crime
punished. It was intended, whenever a mode of proced-
ure was adopted, that mode should be uniform through-
out the state in all courts of the same grade. This propo-
sition is very different to that contended for by counsel.
If his contention were sound, it would compel the legis-
lature to adopt but one mode of procedure in all cases.
For instance, in case of conversion of personal property,

a party wronged could not elect to sue either in conversion or in replevin.  The legislature could permit him to have but one cause of action.  Such was not the intention, but rather that whatever remedy or mode of procedure was adopted, the same should be uniform in all courts of the same grade.

It is contended that under section 10, article 1, of the constitution, by virtue of which the legislature is given the power to abolish, change, limit, amend or otherwise regulate the grand jury system, the legislature has power to abolish the grand jury system entirely, or to amend or regulate it, but that it was obliged to make the practice and proceedings uniform; in other words, to abolish it entirely, and have prosecutions by information solely, or to retain it and permit prosecution by indictment only. We do not so understand the fundamental law.  If the legislature chooses to permit the prosecution of those charged with crime by either indictment or information, it must make the proceedings and practice uniform in each case, but is not confined to a choice between the two methods of prosecution.  The two are very different propositions.

It is further urged that the legislature, by leaving it discretionary with the judges of the various district courts to call a grand jury or not, and thereby determine whether criminal charges shall be preferred by indictment or by information, has violated section 1, article 2, of the constitution, which defines the powers of the co-ordinate branches of the government, and inhibits those persons occupying one department from exercising any power properly belonging to either of the others, except as shall be in said instrument directed or permitted, in other words, that the legislature has conferred upon the district courts legislative powers, in violation of said section.  It is urged that it is the function of the legislature solely to determine the organization, practice and proceedings of the courts, and that it can not delegate that function to a judge or court.  The proposition

is doubtless true, but we fail to see the connection be-
tween these functions and this act of the legislature
which merely leaves to the discretion of the court
whether a grand jury shall or shall not be called. If one
be called, prosecutions during that term shall be by in-
dictment; if it be not, then by information. Has the
legislature conferred upon courts any power to prescribe
the procedure in either event? It were absurd to call
the act of the court in ordering a grand jury the exercise
of a legislative function. It seems eminently judicial.

Then, it is contended that the law is special legislation,
in contravention of section 15, article 3, of the constitu-
tion, for the reason, for instance, that the legislature
can not provide that prosecutions shall be by indictment
in Douglas county and by information in Lancaster
county. A sufficient answer to the argument would be
that the act in question does not so provide. But it is
urged that such may be true in fact, if the courts in
Douglas county call grand juries, while those in Lancaster
county fail to call them. True, but the courts of one
county are not required to proceed in one way only, and
those in the other in the other way. The courts in both
counties may proceed in both ways, or in either, as may
seem to them best suited to the exigency to be met.
There is no feature of special legislation about an act of
that kind. So it is argued that under the constitution,
and in the nature of things, the power to determine
whether proceedings shall be by information or by indict-
ment is legislative. We do not assent to the proposition
as made, or as intended to be applied. The power to
prescribe that prosecutions shall be by either informa-
tion or by indictment, or by both, is legislative; but it
is not a legislative act to elect which of two permitted
methods shall be adopted in any particular case. That
is judicial, and may be executive or administrative. Sec-
tion 468 of the Code of Criminal Procedure permits the
court, under certain circumstances, to either accept or
reject a juror who discloses that he has formed an opin-

ion relating to the guilt or innocence of an accused person. Is the act of the court in exercising this discretion a legislative one? It is quite as much so as its act in determining to call or not call a grand jury. Such are all judicial acts, the doing or not doing of which is within the sound legal discretion of the court. In so doing, it is not "passing new rules for the regulation of new controversies"; it is merely applying one of two methods of procedure prescribed by the lawmaking body, either of which it is at liberty to choose. Again, the statute gives parties to litigation the right to a trial by a jury in law cases. It also permits them to waive a jury and try the cause to the court. In such instance, of trial to the court, do the parties perform legislative functions, and by electing, suspend the general law respecting trials by jury? Do they, in such instances, cause the general law to lack in uniformity? So parties have the right, by general law, to have their causes tried before the regularly constituted courts. It also permits the court (section 299, Code of Civil Procedure) to direct a trial by a referee. In such instance, does the court perform legislative functions, and suspend the operation of a general law? So it may direct a verdict, in certain instances, instead of submitting the facts to a jury, and may in many instances, readily recalled by the curious, exercise its discretion in electing to pursue one of two methods of procedure prescribed by the legislature, without in anywise usurping legislative prerogatives. To sustain his argument, counsel cites the court to *King v. State of Tennessee*, 3 L. R. A., 210; but this case is not in point. In that state, by general law, juries in criminal cases are required to be kept in charge of an officer during the trial, and are not permitted to separate. The legislature, without in anywise referring to this general law, attempted to confer upon courts the right, in their discretion, to suspend this general law, in certain instances, and the court very properly held that the attempt to confer upon the courts the power to suspend or to enforce the general

law, as they were so minded, was attempting to confer upon them legislative powers. The following language of the court very clearly distinguishes that case from the point under consideration in this. The court says: "If this had been a general law, authorizing the court to disperse juries in the character of cases mentioned, except upon cause shown for the rule, or even without qualification, the question would have been different." It would seem clear that no legislative function is performed by the court in ordering or failing to order the calling of a grand jury.

It is claimed there is no warrant in the constitution for electing county attorneys, but that the constitution contemplates the election of district attorneys only, and that the case having been prosecuted by a county attorney, the conviction is void. There is now no such office in this state as that of district attorney. That was not an office called into existence by the constitution, but existed at the time that instrument was framed and adopted. General Statutes, ch. 5. The existence of the office of district attorney was recognized by the fundamental law, and the incumbents were, by section 6, article 16, of the constitution, continued in office until the expiration of their respective terms. This section reads: "The district attorneys now in office shall continue during their unexpired terms to hold and exercise the duties of their respective offices in the judicial districts herein created, in which they severally reside. In each of the remaining districts one such officer shall be elected at the first general election, and hold his office until the expiration of the terms of those now in office." The constitution created several new judicial districts, and the section quoted merely provided for the continuance in office of the incumbents and for the election of district attorneys for the districts so created, and expressly provided that the persons so elected should hold the office until the expiration of the terms of those then holding such office, but no longer. There is no provision of the

constitution that we are aware of which creates the office of district attorney, and the office having been established by the legislature, it had the undoubted power to abolish it, which it has done. Session Laws, 1885, ch. 40. The office of district attorney having been abolished, there was no district attorney to prosecute this defendant. It is true the office of county attorney was not created by the constitution, but by legislative enactment. Compiled Statutes, ch. 7, sec. 15. The power of the legislature to create such an office can not be doubted, in the light of section 4, article 10, of the constitution, which declares that "the legislature shall provide by law for the election of such county and township officers as may be necessary." The number and character of county offices that may be created rests in the discretion of the lawmaking body. The office of county attorney having been created by law, it was the duty of the incumbent thereof to prosecute the defendant. This is manifest from a mere reading of section 16, chapter 7, Compiled Statutes, which is in the following language: "It shall be the duty of the county attorney to appear in the several courts of their respective counties and prosecute and defend, on behalf of the state and county, all suits, applications or motions, civil or criminal, arising under the laws of the state, in which the state or the county is a party or interested." We repeat, obviously it was the duty of the county attorney to file the information against the accused, and to prosecute him for the offense therein charged. Criminal Code, ch. 54.

It is next urged that a preliminary examination should have been accorded the accused. There is no merit in this, since the record fails to disclose that he was not given a preliminary examination before the filing of the information. It is also said that the defendant could not waive a preliminary hearing. The record fails to show any such waiver. Moreover, the objection was not made in the district court, at least before the plea of not guilty was entered, hence it can not now be urged. Criminal

Code, secs. 440, 444. *Davis v. State*, 31 Nebr., 247; *In re Betts*, 36 Nebr., 282; *Hill v. State*, 42 Nebr., 503.

Without pointing out to the court any particular reason therefor, it is insisted that a motion for continuance filed in Buffalo county and another in Dawson county should have been granted. We have examined the motions and evidence in support thereof, and can find no error in the proceedings. The granting or refusing of continuances rests in the discretion of the trial court, and its ruling in that regard will stand, unless an abuse of discretion is established. *Welsh v. State*, 60 Nebr., 101.

The jury that tried the defendant was drawn under the provisions of section 664 of the Code of Civil Procedure, no jury being in attendance at that term. It is claimed and argued at great length that defendant was entitled to a jury selected under the provisions of sections 658 *et seq.* We have held contrary to that contention a number of times, and that the court might order the sheriff to summon jurors under section 664 of said Code when there is no panel of petit jurors. *Welsh v. State, supra,* and cases cited; *Carrall v. State*, 53 Nebr., 431. It is insisted on that point that section 664 is in contravention of said section 19, article 6, of the constitution; and again we say the rule of uniformity there promulgated does not inhibit the legislature from providing more than one form or method of procedure in any case, provided all such forms or methods are equally applicable to all courts of the same class or grade. We have examined the arguments advanced in support of the illegality of the manner in which the jury was drawn, and are of opinion that none of them is tenable. The jury was drawn in strict accordance with the statutes and within all requirements of the fundamental law.

Several errors are assigned relative to the rulings of the court in impaneling the jury. These alleged errors we will examine in the order presented, prefacing, however, with the remark that there is nothing in the certificate of the trial judge settling the bill of exceptions

Dinsmore v. State.

which entitles defendant to be heard on this question, as the evidence relative to impaneling the jury is not embraced in the terms of said certificate. However, as the case is of exceeding gravity, the court will examine the questions raised as if they were so included. It is objected that one Peter Kinnan, called as a juror, and said to have been excused by peremptory challenge of defendant, should have been excused for cause on challenge by defendant. The record discloses that Kinnan was excused by the court for cause. It also shows that he was peremptorily challenged by defendant. Such a record can not import verity, for it contradicts itself, for which reason the court is unable to examine further into the alleged error.

Objection is made to the ruling of the court refusing to excuse one W. A. Love on defendant's challenge for cause. Part of his *voir dire* examination is as follows:

Q. Now, the opinion you had when you first read this account you have not changed, because you have not since heard anything to the contrary?

A. Nothing since, no, sir.

Q. Now, your opinion, I suppose, will remain unchanged until you hear some evidence in the case?

A. Certainly.

Q. In other words, it will take some evidence to change your present opinion?

A. Yes, sir.

Q. And that opinion is concerning the guilt or innocence of the accused?

A. Certainly.

And in response to questions put by the court, after having been challenged by defendant, he answered, in part, as follows:

Q. Do you say that at this time you have an opinion concerning the guilt or innocence of the defendant, a well defined opinion in your own mind?

A. No, no I couldn't form a well defined opinion from what I read, of course I had an impression.

Q. And you say the impression you had at that time you have now?

A. Never had anything to contradict it.

Q. Now you say that impression didn't amount to an opinion?

A. No, sir.

Q. Then you can't say that you now have an opinion concerning the guilt or innocence of the defendant?

A. Couldn't say that I had.

And in response to questions put by the court the juror further testified that he believed he could sit as a juror in the case and render a fair and impartial verdict regardless of what he had read, and that he thought he could start into the case with his mind as free from bias or prejudice against defendant as though he had not read these newspaper accounts. The challenge was thereupon overruled, and exception taken. Another juror testified on his examination that he had read an account of the tragedy in the newspapers; that he did not think it had made a great deal of an impression on his mind, but would not say that he had not formed an opinion; that he had no fixed opinion; that he did not think it would require very much evidence to change his opinion or impression; that it might take some. Whereupon he was challenged by the defendant. In answer to interrogatories on the part of the court he said he did not think his impression amounted to a fixed opinion; that he hardly considered it an impression; that the opinion or impression he had would not influence his mind during the trial, and that he could entirely exclude it from consideration in making up his verdict; whereupon the challenge was overruled. Another juror testified that he had read an account of the homicide in the papers, that from it he had not formed an opinion as to the guilt or innocence of the defendant; that what he read he did not think purported to be a detailed account of the evidence in the case; that the reading made no more impression on his mind than an occurrence of that kind would gen-

erally make; that he thought he remembered the nature of the articles read, and still had the same impression that was formed at the time of reading them; that he did not think the impression he formed was at all relative to the guilt or innocence of defendant, and that he had no impression as to his guilt or innocence; that the impression he got at the time of reading was that there was a tragedy committed; that he had some impression as to who committed the act, but not as to his guilt or innocence; that he did not think it would take any evidence to remove any impression he had relative to the guilt or innocence of the accused, that he had no opinion as to that. On cross-examination he stated that he at the time of reading the paper had formed an opinion as to who the guilty party was "as to the statement in the paper"; that he did not know as he could call it an opinion, it was merely an impression that he got in his mind when he read it; that, calling it an impression, he thought he still had that impression; that he did not think it would take evidence to remove such opinion or impression; that he presumed it would remain with him until modified or changed by such evidence as might be introduced on the trial; that it might take some evidence to change that impression as to who the guilty party was; that the defendant was mentioned in the article he read as the alleged perpetrator of the deed, he thought. In response to questions put by the court, he stated that he could sit and impartially try accused regardless of any impression he might have, and the challenge was overruled. The action of the court relative to accepting these jurors is urged as erroneous. The evidence as a whole shows that any impression or opinion these jurors had was wholly hypothetical, which brings the case within the principles announced in *Basye v. State*, 45 Nebr., 261, where all objections urged by defendant are discussed and resolved against him, and the earlier opinions of this court cited by defendant are discussed and distinguished. The dis-

32

cretion conferred by section 468 of the Criminal Code was in nowise abused by the trial court relative to any one of these jurors, and no error prejudicial to accused was committed.

Two other jurors were also asked by the state, on their *voir dire* examination, if they had any objections or conscientious scruples against the infliction of capital punishment, if the evidence warranted it. It is urged that the question was improper, because it tended to exclude from the jury any one who might lean towards the infliction of a lesser penalty. This court has decided adversely to defendant's contention in *Hill v. State*, 42 Nebr., 503, and no substantial reason is advanced for receding from the position there announced. The entertaining of conscientious scruples against the infliction of the death penalty is ground for challenge for cause under section 468 of the Criminal Code; hence it follows that it is proper to interrogate a venireman on that subject.

Objections are urged to rulings of the court permitting two physicians, who saw the body of deceased as it lay on the bed where he had met his death, to answer the following questions: "What position would the body necessarily have lain in for the blood to have the course from the wound which you found it had taken?" It is claimed that it was both incompetent and not a matter for expert testimony. This evidence was offered, evidently, to corroborate that of Mary Lane, who testified that Dinsmore, who had come into the kitchen where she was, after having committed the deed, remained there a short time and left, stating that he would go to the chamber where his victim lay and so arrange the body as to lead to the conclusion that he had committed suicide; the answer of the physicians tending to show that the body must have lain in a different position when the blood flowed from the freshly made wound to that in which it lay when first found by witnesses. The evidence was competent, whether it was or was not a matter for expert testimony. The witnesses had seen the body and

examined it and all the surroundings, and were competent to testify to the position in which it must necessarily have lain in order that the blood should have flowed from the wound in the direction taken. It was such a conclusion, if it was a conclusion, as was competent, under all the circumstances, and was a fit subject for expert testimony, and the witnesses had qualified as such.

It is next urged that the court erred in permitting Mrs. Laue, the principal witness for the prosecution, to testify as to the fact and time when illicit relations began between her and defendant, on the ground that no foundation for the question was laid, and that it was leading and incompetent. The question, with the objection made, is:

Q. When did improper relations begin between you and him, if they did so begin?

Defendant objects as leading. Objection overruled; defendant excepts.

There was no objection made, other than that it was leading. It is within the sound legal discretion of the trial court to permit leading questions to be put to witnesses. If this question was leading, the record discloses a sufficient justification to permit it to stand, for this woman was by it called to disclose to the world that she had lost the immediate jewel of womanhood, her chastity, and as a rule women do not readily lay bare their shame. The discretion of the trial court was not abused.

It seems that, after the burial of her husband, Mrs. Laue, who up to that time had insisted that her husband had committed suicide, made a confession, signed and sworn to by her, implicating the defendant in the murder of her husband. On cross-examination it was developed that after making this confession she was examined by the county attorney, but not under oath, relative to the facts in the case, and such examination was taken down in shorthand by some person. It further developed that the statement then made by her, if ever reduced to shorthand, was never afterwards read to or seen by her, nor

did she sign or swear to the same. On trial counsel for defendant demanded possession of this statement, as well as of her confession. The latter the court ordered turned over to her, but refused to order the statement not signed by her to be turned over to defendant. This refusal it is urged is a denial of the right of defendant to a full and fair opportunity to cross-examine the witness concerning the facts in the case. We can not see that it was. If the statement was ever transcribed, a fact not positively sworn to by any one, it was the property of the county attorney. It was nothing more than a brief of the evidence prepared by the county attorney for his own convenience in trying the case, or preparing it for trial. We can not imagine any reason for compelling the county attorney to turn over to counsel for defendant his private memoranda. The defendant had no right to it, and the court was right in refusing to compel a surrender of it.

The confession of witness turned over by the county attorney to counsel for defendant was by him introduced in evidence as defendant's Exhibit No. 1, and on cross-examination Mrs. Laue was asked referring to the statement made to the county attorney, "In the other statement which you made and which you have testified about, did you recite what was in this statement, Exhibit 1, or do you know?" To this objection was made, as incompetent, irrelevant, immaterial and no foundation laid, which objection was by the court sustained, exception being duly taken. This ruling is alleged as error. As before observed, this statement was not admissible in evidence, and as counsel was not entitled to it, could not be made the basis of an impeaching question, the only purpose that could have been served by permitting the witness to answer. The matters relative to these statements were brought out wholly on cross-examination, and we think the lower court did not unduly restrict counsel in such cross-examination.

Another question propounded by counsel for defendant on cross-examination was: "Did you, in any of these

statements which you have made with reference to the killing, [state] that you had no poison in the house except strychnine and laudanum, and that the strychnine and laudanum was kept down-stairs?" To this the state objected, because there was no foundation laid, and no time and place fixed. The court sustained the objection, for this reason, and the further one, that it was improper cross-examination. To the objection that this ruling was erroneous, we say that it was clearly not cross-examination, all the evidence relative hereto having been brought out on cross-examination. There was no contention that Laue met his death by poison. If it was an attempt to impeach the evidence of witness, no foundation was laid for such impeachment, and such impeachment, if accomplished, would have been upon an immaterial matter. It is urged, however, that it would have thrown light upon the means by which Mrs. Dinsmore met her death; but Dinsmore was not on trial for the murder of his wife, and the fact that Mrs. Dinsmore met her death on the same night and in the same house in which Laue was murdered was not an issue in the case, further than such fact may have served to throw some light upon the homicide in question; and it was an attempt to cross-examine her upon a matter not in issue, and upon a question not brought out on the direct examination.

Certain evidence introduced served to prove that Dinsmore paid improper attentions to Mrs. Laue prior to the night of the homicide, and for some time prior to the tragedy he more or less neglected his wife. This evidence is claimed to be immaterial and highly prejudicial to defendant. We think it admissible, if for no other purpose than as tending to establish a motive for the crime.

One Overmier was permitted to testify, over objections duly made on behalf of defendant, that he took defendant to the residence of deceased, after the tragedy, and while accused was under arrest, the corpses of Laue and Mrs. Dinsmore being then in the house; and that Dinsmore lifted the covering from one of them and said, "Humph,

I wonder how long I will have to stay in that God damn jail down there." This testimony was, on motion, stricken out. It is, however, contended that the prejudice resulting from the answer could not be and was not cured by striking it out, but we do not think so. The court had no means of knowing beforehand whether the evidence was or was not relevant. So far as the court could tell, the question propounded was calculated to bring out testimony of an admission of guilt on the part of defendant as readily as it admitted of evidence like that actually given. The question itself was entirely proper, although it developed that the evidence actually elicited by it was not relevant. It can not be said that the court erred in permitting the question to be answered, and it would be a sad comment on modern jurisprudence if it were possible for a witness, in answering a perfectly proper question, to commit the trial court to an irremediable error. Until courts are endowed with foreknowledge, the adoption of such a rule would prevent the conviction of any criminal, if a witness for the state, through either design or inadvertence, testifies to irrelevant facts while answering a proper question. The court very appropriately permitted the question to be answered, and wisely struck the answer from the record as soon as it developed the fact that it was improper. In this no error was committed which was not cured by the court.

Some ten or eleven assignments of error raise questions of alleged improper remarks made by counsel for the state on argument to the jury. The language excepted to is too lengthy to insert in this opinion. In every instance, objections to these remarks made by defendant, or in nearly every instance, were by the court sustained. The court was exceedingly careful of defendant's rights in the premises, as an examination of the record will disclose, and in several instances complained of, excluded remarks that were perfectly proper, in summing up the case to the jury. Whenever counsel may have overstepped the bounds of propriety, the court very willingly

and promptly sustained objections to the same. A careful examination of the record convinces the court that defendant was in nowise prejudiced in the premises.

Another alleged error is one going to the action of the trial court in refusing a new trial because, it is claimed, one Tussing attempted an assault upon defendant after the trial had ended, and while the jury was deliberating, which fact of attempted assault is insisted was communicated to the jury and by its members discussed during such deliberation. We can not imagine any reason for assuming that an attempt at violence against the person of accused by some third party would influence the jury in its conclusions concerning the guilt or innocence of defendant of the crime charged. But, be that as it may, the evidence relative to the fact of the attempted assault, and of its communication to and discussion by the jury, was merely hearsay, and, therefore, insufficient to establish such fact.

Exception was taken by the defendant on the trial to the giving of the eleventh instruction by the court, on its own motion, which is as follows:

"No. 11. Mrs. Laue has been called by the state and has testified to facts and circumstances, tending to show the guilt of the defendant; and defendant's counsel, upon the cross-examination of this witness, has shown that at the coroner's inquest she made other statements concerning the same subject, entirely different from those testified to by her here. As an explanation of this difference in her testimony, she here claims that she, at the time of the inquest, was under the influence and control of the defendant, and made such statements at his request, and by his direction; and she here says, that the statements made at the inquest were untrue. Now, it is for you to determine from all the testimony, facts and circumstances shown, as to whether or not the statements made at the inquest or the statements here given by her or either, are true. If you believe that her statements at the inquest were true, then it will be your duty to entirely disregard

all the uncorroborated testimony that she has here given, which is in conflict with that given at the inquest. On the other hand, if you believe her testimony given at the inquest was false, and believe her explanation of the giving of the same is true, then you should give her evidence in this case, upon this trial such weight and credit as you think it fairly entitled to. Evidence of her testimony at the inquest was offered by the defendant for the purpose of impeaching her testimony here given. And it is a rule of law that if a witness has knowingly sworn falsely to any material matter in the case, then the jury are at liberty to entirely disregard the testimony of such witness, upon all matters concerning which she is not corroborated. Whether or not she has been successfully impeached, so that her credibility has been entirely destroyed is a question exclusively for you to determine. You are not bound by any rule of law to disregard her evidence wholly, but may take it into consideration for what it is worth, together with the other evidence in the case; for, though a witness may have been impeached on some material point, his evidence on others may be creditable in itself, or may be corroborated by other evidence which is creditable."

In the first place it is insisted that it was error to give this instruction, for the reason that it singled out by name a witness and discussed her testimony. Mrs. Laue was a witness called on behalf of the state, and it might have urged against this instruction the point now brought forth by defendant, but he is not in position to complain, since she was not his witness, and, moreover, he requested an instruction, which was given by the court, singling out this same witness and her testimony quite as explicitly as the one copied above. Said instruction requested by defendant follows:

"In considering the testimony of Mrs. Laue, it is proper for you to remember that she testified before the coroner's jury to a different state of facts from that to which she testifies here. You may look to the testimony of other

witnesses, and to all the circumstances shown by the evidence to surround the case, for facts which may tend to corroborate her evidence taken during the trial; and you will reject her testimony, unless you find that it is corroborated as aforesaid, or unless you are satisfied that it is true, notwithstanding that she has made other and different statements under oath."

It is urged that the instruction complained of gave undue prominence to that portion of Mrs. Laue's testimony explaining how she came to swear falsely, as she says, at the inquest. This objection is not well taken. It did not make prominent her explanation of the discrepancies in her statements, but merely called the attention of the jury thereto, leaving it to them to determine from all the facts and circumstances proven which statement was true and which was false. In fact, the instruction was favorable to the defendant. Another criticism made upon this instruction is that it did not call to the attention of the jury the alleged written confession of Mrs. Laue brought out on her cross-examination and offered by the defendant. A sufficient answer to this contention is that no request to so charge was made by defendant. One can not predicate error upon the failure to charge, unless a proper instruction covering the point has been tendered by him. *Housh v. State*, 43 Nebr., 163.

It is finally urged that the court erred in giving instruction numbered 16, which we quote:

"You have heard the evidence offered on both sides of the case. From that evidence, you learn what the facts are. The attorneys have had a wide range of discussion; they have had complete freedom of argument before you, upon all questions of fact. It is their privilege in the argument to criticise the evidence. Those for the state to criticise the conduct of the prisoner; those for him to criticise the conduct of the witnesses against him; to impugn their motives, if the evidence justifies it; to assault the credibility of the witnesses. Counsel for the state

have called your attention to the children of the deceased, and have intimated that, because of your sympathy for their fatherless condition, you should punish the defendant. Counsel for the defendant have pointed out to you the horrors of the penitentiary and of death upon the gallows, and have made appeals to you for mercy. Now I desire to impress upon you that you have nothing to do with questions of mercy. You are ministers of justice. The administration of mercy is a power that is vested in the executive department of our state, in the exercise of its authority to pardon. It is absolutely necessary and essential to the preservation of society that law should be enforced, and especially where acts of violence have been done. If we would preserve society, and the rights of individuals, the law must be obeyed, and violaters of the law punished; and you as jurors would be faithless to your trust if you should return a verdict of acquittal in this case, when the facts demanded a conviction. And above all, it is important that innocence should not be punished. You are not impaneled for vengence, but to subserve the ends of public justice, and you would be disloyal to your obligation if you should find the prisoner guilty when the evidence required his acquittal. I have said this to impress you with a sense of responsibility which you owe to your conscience and oaths, that your verdict should be honest, intelligent and in conformity to the evidence and the law. Do your duty honestly, conscientiously, courageously and justly, as you see it under the evidence and the law of this case."

It is urged that the instruction is argumentative and declamatory, and by it the court invaded the province of the jury, and that it was erroneous to inform the jury that the state had a right to criticise the conduct of the prisoner. The instruction was neither argumentative nor declamatory, nor did the giving of it invade the functions of the jury. It was merely a usual cautionary instruction, which the trial court may, in its discretion,

give, or not.  *Smith v. State*, 4 Nebr., 277; *State v. Talbott*, 73 Mo., 347.

But it is said that it was error to inform the jury that counsel for the state might criticise the conduct of the prisoner, since he was not a witness at the trial.  His conduct, as disclosed by the evidence, was a proper subject of discussion, whether he was or was not a witness.

It is urged that it was prejudicial to designate the defendant as the "prisoner." This objection carries its own refutation upon its face, and deserves no further comment.  The same may be said of some other criticisms upon the instruction.

It is suggested that the court erred in informing the jury that they had nothing to do with questions of mercy.  Manifestly this is the law, though the statute confers upon the jury the right to fix the penalty.  In determining the punishment they have no right to be actuated by considerations of mercy, but should be guided alone by the evidence, the facts and circumstances disclosed by the record, under the instructions of the court.  If the evidence reveals a case in which the death penalty should be fixed, the jury have no right to be deterred from discharging their sworn duty through any sympathy for the accused.  Mercy lies solely within the province of the executive in his exercise of the pardoning power.

Again it is said the court erred in telling the jury "you would be disloyal to your obligation if you should find the prisoner guilty when the evidence required his acquittal." This was entirely sound.  By it was meant that the defendant should not be convicted upon insufficient evidence.  The jury had been previously instructed as to the burden of proof, and that the guilt of the defendant must be established by the state beyond a reasonable doubt.

We have carefully and faithfully examined the record, and all objections urged against the conviction, and the conclusion is irresistible that the defendant has been ac-

corded a fair and impartial trial, and that the verdict is a just one. The judgment is accordingly

AFFIRMED.

NOTE.—The grand jury is not a *sine qua non* in the prosecution of offenses under state law. Amendments 5 and 14 of the United States constitution do not apply to the matter of the prosecution of crimes under state law. The words "due process of law" do not necessarily require an indictment by a grand jury. *Lybarger v. State*, 2 Wash., 552; *State v. Nordstrom*, 7 Wash., 506; *Spies v. Illinois*, 123 U. S., 131, 8 Sup. Ct. Rep., 21; *Hurtado v. California*, 110 U. S., 516; *Hawkins v. State*, 60 Nebr., 380. But see dissenting opinion of Mr. Justice Harlan in *Hurtado v. California, supra*.—REPORTER.