[Crim. No. 1604. Third Appellate District.—April 29, 1938.]

THE PEOPLE, Respondent, v. ROBERT DUANE SMITH, Appellant.

DeCastle & Devoto for Appellant.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The defendant was indicted and tried for an offense based upon subdivision 3 of section 261 of the Penal Code. The trial resulted in conviction. From the denial of the defendant's motion for a new trial, and the judgment based upon the verdict, the defendant appeals.

A great number of reasons are assigned by the appellant as to why the judgment should be reversed. All of these reasons we have considered, but most of them are of such minor importance as not to require consideration in this opinion.

The principal reasons assigned for reversal are as follows: The alleged failure of the prosecution to prove the venue of the offense charged; the admission of the testimony over the defendant's objection of the witness, Miss Blessman; prejudicial conduct on the part of the district attorney in his argument to the jury; and errors by the court in instructing the jury. The further objection is presented that the court erred in denying the appellant's motion for a directed verdict and requiring the defendant to introduce testimony as to the venue of the offense. While this contention is strenuously urged, it appears to us to be absolutely without merit. If, as contended for by the appellant, the prosecution had failed to introduce testimony from which the jury could find that the offense was committed in the county of Sonoma, as alleged in the indictment, the defendant could have rested without introducing any testimony whatever upon that subject. That he introduced testimony tending to controvert the testimony of the prosecution, was a purely volun-

tary act on his part, and of course created only a conflict in the testimony, which presented, first, a question for the jury, and if there is sufficient testimony in the record upon which the jury might reach a conclusion that the offense was committed in the county of Sonoma, the verdict cannot be disturbed on the question of venue.

Before setting forth the testimony of the prosecuting witness as to the place where the offense was committed, we may refer to the testimony of the witness Moodey, who located the situation of a certain reflectorized sign, identified by the prosecuting witness and by Moodey testified to be about 3.9 miles within the boundary line of the county of Sonoma, and that from this reflectorized sign, Mission Inn, the place where the prosecuting witness was temporarily staying, was a distance of some 4.1 miles. The testimony of the prosecuting witness states that the attack was made in a certain pasture to which the defendant had driven the automobile in which they were riding, and that this reflectorized sign, which, by the way, is a three-way sign pointing to San Francisco, Santa Rosa and Sonoma, was observed by her very shortly after the attack; that after the attack, on the way back toward Mission Inn, she asked the defendant for a drink of water, to which he replied that it would only be five minutes until they reached the Mission Inn.

On cross-examination the prosecuting witness limited the time between the second attack and their arrival at the Mission Inn as being from twenty minutes to a half hour. It is evident that after the attack some little time elapsed before the defendant and the prosecuting witness were prepared to start back toward the Mission Inn, and having approximately eight miles to travel, furnishes a basis for the jury to conclude that the pasture referred to was within the boundary lines of the county of Sonoma. The record does not show, so far as we have been able to discover, nor have we been cited to any portion of the transcript, indicating that any effort was made either by the prosecution or the defense to locate the pasture.

Considerable portion of the testimony relates to the movements of the defendant and the prosecuting witness on the evening of August 20, 1937. It appears that they left the Mission Inn some time in the evening of that day and visited a large number of roadhouses and bars, and partook quite liberally of intoxicating liquors. The testimony would indi-

cate that they also visited Santa Rosa and Napa. The prosecuting witness testified that she thought the last place they visited was a barroom in Santa Rosa. The defendant testified that the last place they visited was in Napa, which place they left at about 2 o'clock, and drove around over different highways for a considerable length of time preceding the attack; that in driving around he took the wrong road and followed the highway leading to Vallejo, and that the attack occurred in a pasture not far from the road leading to Vallejo in the county of Napa.

It also appears from the testimony in the record that the appellant, preceding the attack, had consumed, as we have said, a great many drinks of intoxicating liquor, and at least a sufficient number to inflame his passions and render his statements of what took place on the night of August 20th and the morning of August 21, 1937, decidedly uncertain as to its correctness.

The prosecuting witness in her testimony stated that in drinking with the appellant she drank ten small Martini's, two drinks of champagne, and an after-dinner drink, the name of which she did not recall. The defendant not only drank with the prosecuting witness, but the testimony shows that he also drank with others.

The testimony, in addition to what we have stated, given by Miss Nichols, the prosecuting witness, upon which the prosecution relies to establish venue, is as follows:

"Q. Now Miss Nichols, where did you go after leaving this place in Santa Rosa? A. I can't recall in which direction we left Santa Rosa, on which road we left, but we started to what I thought was toward home. Q. Now, did you continue to drive with Mr. Smith? A. We drove around several different roads, turns and twists. Q. Did you recognize any of them? A. No, I didn't recognize anything like the road that we came out on. I know it wasn't the same roadway we came out on. Q. You mean the road you came in to Santa Rosa, you mean? A. Yes. Q. How long did you continue to drive? A. It seems to me hours, but I guess we drove about an hour. He turned to the left into a pasture and came to a stop. Q. And what did he do with reference to the car? Now, Miss Nichols, to where did you proceed from that point? A. We turned out of the pasture, we come about a half a block and I saw a house at the side of the road. Q. Did you do anything at that point? A. I said, 'Please

get me a drink of water, please get me a drink of water.' I felt very faint and was afraid I would lose consciousness. I did not know what he was doing; at the time we were at the house, I thought he stopped the car to get me a drink of water. He said, 'Sure, I will get you a drink of water.' Mr. DeCastle: What did you say? A. He said, 'Sure, I will get you a drink of water.' Mr. McGettigan: Q. Did he stop the car? A. Yes. Q. Now, then, what took place after that, Miss Nichols? A. When we left the spot I said, 'You are not going to get me a drink of water?' He said, 'It will be only five minutes until you arrive home and you can get it then.' Mr. DeCastle: What was that? (Reporter reads last answer.) Mr. McGettigan: Q. At what point did you stop with reference to the point where he said, 'It will be only five minutes until you arrive home?' A. From the point, it was not very far until I saw a sign pointing to San Francisco; I thought again he wouldn't take me home, and I thought he would take me some place and get rid of me. Q. You saw a sign indicating San Francisco, is that correct? A. Yes, I did. Q. And have you since seen that sign, Miss Nichols? A. Yes. Q. And when did you see it last? A. Saturday morning. Q. This sign you saw Saturday morning was the sign you recall seeing on the morning of August 21, 1937? A. Yes. Q. And that sign is situated in Sonoma County, Miss Nichols? A. Yes, as far as I know the County, it is. Q. Miss Nichols, are you able to state approximately how long it took you to arrive at the Sonoma Mission Inn on this morning of August 21, 1937, from the time you observed this San Francisco sign? A. It seemed like a long time; I think it was about a half hour. Q. Do you know what road you came in on? A. I recognized the Standard Oil station on the road coming from Sonoma to the Inn; I knew that I was going home then. Q. That is the landmark that you recognized, that is correct? A. Yes.''

Mr. DeCastle then questioned Miss Nichols on cross-examination as follows: "Q. I see. Now, when you then started back, left this place and started back, how long a time did you drive before Mr. Smith stopped? A. It seemed about an hour. Q. About an hour? A. Yes. Q. In what manner was Mr. Smith driving; was he driving fast or just going along talking, visiting? A. He was driving, I should say, thirty-five miles an hour. Q. And was it from that time that

you left this place until you stopped after this drive that you noticed this sign, 'To San Francisco'? A. No, I didn't notice the sign, 'To San Francisco', then. It was after the second attack when I saw the sign. Q. And then where did you go? A. We drove a very few minutes and got near a house there and I asked him to get me a drink of water. I felt very faint and thought I wouldn't last. Q. You continued driving through the pasture? A. No, we continued on the same road. We turned to the left out on the road from the pasture, but he didn't go back. The Court: But he did turn around in the pasture and go out on the highway again? A. Yes. Mr. DeCastle: Q. When he stopped, how long would you say it was from the time you got in the car in the pasture until you stopped by this house and asked for a drink? A. A few minutes. The Court: A few minutes. Mr. De Castle: How long? A. Oh, it might have been five, ten or fifteen minutes. Q. Could it have been five minutes? A. It could have been. Q. Could it have been three minutes? A. No, more than that. Q. Was it any more than five minutes? A. I don't know; at a time like that, time doesn't mean a great deal. Q. And that was the second? A. That was the second attack. Q. Now, when you left there, where did you go? A. We drove aways until I saw a sign, 'To San Francisco', and he took another road; I didn't know where I was until I came to the Standard Oil Station, and I recognized that as a landmark going to Sonoma City; I had been by there. Q. Now, Miss Nichols, how long did you say you drove after leaving this place where the boy sang, until Mr. Smith stopped the car? A. It must have been an hour we drove around on the road. Q. You think about an hour? A. Yes. Q. What is your best recollection of the interval of time elapsing from the time Mr. Smith stopped the car in the pasture and made the attack you described, and the time you next described? A. It is hard to say, it might be five, ten or fifteen minutes. Q. Could it have been longer than that? A. It might have been. Q. Have you any definite recollection on that, Miss Nichols? A. No, I haven't. Q. Is was prior—withdraw the question. And have you definite recollection, or any recollection as to the amount of time elapsing between the second attack until you arrived at the Sonoma Mission Inn? A. It seemed twenty minutes or half an hour.''

The fact that the appellant testified directly contrary to the testimony given by Miss Nichols, and introduced testimony indicating that the last place they left was the city of Napa, instead of Santa Rosa, raised only a conflict, which, of course, presented a question for determination by the jury, and not by this court.

Being of the opinion that what we have here set forth is sufficient to sustain the finding of the jury that the offense was committed in the county of Sonoma, the appellant's contention that it was committed elsewhere must be disregarded.

█ It appears from the record that prior to the trial a witness by the name of Miss Blessman, who was acquainted with the appellant, had a conversation with him relative to the offense for which he was about to be tried, and in that conversation reference was made to certain lascivious acts and illicit conduct by the defendant with a certain other woman, and in that conversation Miss Blessman also stated to the defendant, in substance, that he knew he had committed the act with which he was charged, to which the appellant replied that he ought not to be sent to the "Pen" for such an act. It also appears in the record that Miss Blessman reproved the appellant somewhat for his conduct, and called him a sadist.

It is strongly urged by the appellant that the admission of this testimony, which referred to other acts, was erroneous and prejudicial to the defendant. That references to other acts showing lascivious conduct with other women is not generally admissible, is sustained by practically all of the authorities, and under most circumstances the admission of such testimony is held prejudicial. In the instant case that rule does not apply. The defendant himself went on the witness-stand, related all the visits made by him and Miss Nichols on the evening of August 20, 1937, and the early morning of August 21, 1937, and was driving around until he reached the pasture which we have heretofore mentioned, and there by his testimony he tells the whole sordid story of his illicit relations with the prosecuting witness, attempting to exculpate himself by claiming that there was no force or violence used at the time of the attack. Having so related the occurrences to the jury, the admission of Miss Blessman's testimony of other lascivious conduct entirely loses its prejudicial character by the testimony of the defendant himself. Only one question in relation thereto was left to the jury:

whether the act was accomplished by force and violence, or whether it was voluntary on the part of the prosecuting witness. That this testimony in that respect does not bear the impress of truthfulness is established by the testimony of Dr. Andrews, who examined the prosecuting witness about 8 o'clock on the morning of August 21, 1937, and found a number of bruises upon her face, bruises upon her arms, and bruises upon her hands. We may here state that the prosecuting witness in her testimony recounted the fact of the defendant having slapped her on the face a great many times, and that she resisted to the utmost.

As bearing upon this question of resistance, we may state that Miss Nichols gave her weight as one hundred eighteen pounds; the defendant testified that he was exactly six feet tall and weighed two hundred fifteen pounds. The physical contrast needs no comment on our part.

No prejudicial error having been suffered by the appellant by reason of the error of the court in admitting Miss Blessman's testimony to which we have referred, it follows that under section 4½ of article VI of the Constitution, reversal cannot be had by reason of the admission of such testimony.

■ In examining the record we find that no objection was urged or taken by the appellant to the alleged prejudicial remarks made by the district attorney in his argument to the jury. Hence, it is unnecessary for us to express any opinion in relation thereto.

■ It is finally urged that the court misdirected the jury. The instructions are quite lengthy; we have read them carefully, and we find nothing therein prejudicial to the appellant. We may further add that it appears from a reading of the instructions that the jury was very fully and carefully informed as to the law applicable to the case under consideration.

Being of the opinion that the appellant had a fair trial and was justly convicted, it follows that the order and judgment of the trial court should be and they are hereby affirmed.

Pullen, P. J., and Thompson, J., concurred.