HUGH V. GRIFFITH, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

59 N. W. 2d 701

Filed July 17, 1953. No. 33320.

Patrick J. Heaton and Harold E. Connors, for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *C. C. Sheldon,* for defendant in error.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Hugh V. Griffith, identified herein as defendant, was charged with and convicted of the crime of murder in the first degree. The sentence was death. He prosecutes error to review the record of his conviction.

The State offered evidence tending to prove the following matters: The defendant and Anna Frerichs were married March 3, 1941, at Sidney. Thereafter they were in Denver and other places in Colorado, Russell and other parts of Kansas, and in various places in Utah. They did not have a home of their own in Sidney. On numerous occasions during the years following their marriage when not employed they returned to Sidney and lived with the parents of Mrs. Griffith. During the time from May 1951 to January 1952, she was at the home of her parents continuously. Defendant was a laborer. He was not employed continuously. His engagements were irregular and many times of short duration. In more recent periods he worked in the oil fields. He was what is described in the record as a roughneck in the oil fields. When not employed and also while he was working at places near Sidney he lived at the Frerichs home. He would be there for a "week or two and then he would find some other work and then go out again and be gone for a week or two, maybe longer, and then come back."

Defendant and his wife had no children, permanent place of abode, or home of their own. They had many misunderstandings and much unpleasantness. In January 1952, they discussed moving from the Frerichs home. They had a disagreement in the presence of Mrs. Frerichs. She asked if they would be gone before evening and defendant said " 'Anna will be here, but I am going

to get a damn divorce.'" They left the following day. Anna returned on March 9, 1952. Later defendant came to the home of her parents and talked with her. During April he came again and stayed for about 2 weeks. They had a rather severe quarrel late in April. Mrs. Griffith told her husband to leave—"'All you want is revenge.'" He induced her to go with him to Sedgwick, Colorado, on June 4, 1952. They got back to Sidney the afternoon of the next day. They came to the home of her mother, but defendant stopped only to let his wife out of the car. She had a bruised hip and injuries to her neck and chin. He drove near the Frerichs home on the evening of June 13, 1952, but did not get out of the car. His wife went to the car, did not get in, but had a conversation with him. He left and did not return there before the tragedy in which Mrs. Griffith was shot and killed.

The defendant told Mrs. Echo Pingel in Sedgwick, Colorado, on June 3, 1952, as related by her at the trial, that he and his wife could not get along and were separated. The next day he and his wife came to the Pingel home. Mrs. Pingel, her husband, and the defendant had some previous acquaintance. The defendant introduced Mrs. Griffith to Mrs. Pingel. The face of Mrs. Griffith was badly bruised and scratched and her clothing was torn. Mrs. Pingel asked defendant if he had done that to her. He denied it, but Mrs. Griffith said he did it. Later in the conversation defendant said "she got just what she asked for." Defendant stated to Mrs. Pingel on that occasion that his wife had written a letter containing statements sufficient to send her to the pen for 10 to 20 years; that she had been in a motel with a man in Kansas and had accompanied him back to Sidney; that defendant had the register showing she had registered at a motel but not by use of her correct name; that he wanted her to go where he was working but she would not because she had a good steady job in Sidney; and that she only wanted

to stay there because she used dope and she desired to stay and "use that stuff and run around with other men." Mrs. Griffith denied these charges. Defendant complained because his wife had not had children and she said she did not want to do anything about that until they got their troubles straightened out. The witness asked defendant why he did not leave his wife alone, settle down, and behave himself, and his answer was that he was " '* * * doing all right.' " She said she asked him if he would let his wife alone for a couple of weeks while she could settle down and if he would get a place for them to live, and he replied, " 'No; if I can't have her, nobody else will.' * * * 'I will kill her first.' "

The State produced evidence that Mrs. Weert Frerichs, Sarah Anne Frerichs, Johnny Frerichs, Mrs. Catherine Hatcher, and Mrs. Anna Griffith attended a carnival in Sidney from about 8 p. m. until about 10:20 p. m. on the evening of June 20, 1952. They went from the Frerichs home in a car operated by Mrs. Weert Frerichs. They returned to the Frerichs home in the car about 10:30 and stopped in the street, Tenth Avenue, on the east of the Frerichs home.

Mrs. Hatcher had been an intimate friend of Mrs. Griffith since 1928. She had known and been friendly with Hugh Griffith since immediately before his marriage to Mrs. Griffith. They frequently associated in social and family affairs. The Hatcher home was immediately across the street intersection to the southeast from the Frerichs home. Mrs. Hatcher had been and was thoroughly familiar with, knew, and was able to identify the voice of defendant when she heard him speak.

When Mrs. Hatcher and Mrs. Griffith left the automobile in the street to the east of the Frerichs home they went to the private walk north of the home, then west on the walk to near the northwest corner of the house, and south to the door on the west of an enclosed porch.

It was immediately west of and adjoining the kitchen. There was a light in the kitchen. There was no other light in the house or west of it. There were many large trees and shrubs around the house, especially to the north and west thereof. The defendant and his wife used the entrance from the west onto the porch and from the porch into the house at the times they lived there. It was a dark night but there was a little reflection of light through from the kitchen. There was no light shining on the person standing immediately south of the door into the porch when Mrs. Griffith and Mrs. Hatcher came there on the night of June 20, 1952.

Mrs. Griffith preceded Mrs. Hatcher when they walked to the door of the porch. When they came to the door they saw an outline of what appeared to be a man standing south of but near the door. He had a long narrow object in his hand. It looked like a gun. Someone said, " 'This is it.' " It was the voice of a man. Mrs. Hatcher immediately recognized the voice as that of the defendant. She heard Mrs. Griffith say, " 'Oh, no, Hugh' " and she reached for him. Mrs. Hatcher turned and ran down the walk to the north. She heard Mrs. Griffith call " 'Catherine, Catherine,' " the first name of Mrs. Hatcher. She stopped at the window near the northwest corner of the house that opened into the kitchen and called " 'Help, John and Hannah,' " the first names of the parents of the deceased. She then went east to the sidewalk west of Tenth Avenue, turned south, and proceeded towards her home. As she was going south she heard a "blast, and I heard someone scream." She recognized the man standing by the door of the porch by his voice. She was not able to make any other identification.

Mrs. Frerichs, the mother of Mrs. Griffith, had retired for the night in the room on the west of the house immediately south of the kitchen. Between 10 and 11 o'clock that night she heard from her bed her daughter call " 'Mamma, open the door.' " She heard footsteps

running toward the east on the walk north of the house. She went from the bedroom to the kitchen and there she heard a loud blast. She proceeded to the front door near the southeast corner of the house, went out on the lawn, and found her daughter prostrate on the ground. She could see plainly because of a street light across the street. She turned her daughter partly over and saw blood on her chest. She ran into the house and called the officers. The shot she heard was north of the house. The body of the deceased was on the lawn a short distance east and south of the northeast corner of the house.

A doctor was called. He promptly arrived and found that Mrs. Griffith was dead. She had several punctures and numerous lacerations of her right chest and neck. There was evidence of severe bleeding from what appeared to be a gunshot wound recently inflicted. It was the opinion of the doctor that she died as a result of hemorrhage and shock caused by gunshot wounds. The doctor who performed an autopsy on the body of the deceased described its condition in detail and expressed his opinion that the death of the deceased was the result of "hemorrhage and shock—circulatory collapse" caused by gunshot wounds.

A shell casing of a No. 12 Western Xpert shotgun shell was found early the next morning about 20 feet northwest of the northwest corner of the house on the walk from the house to the garage. Some wadding from a shotgun shell was found between the south side of the walk and the north side of the house about midway between the east and west sides of the house. Another piece of the same kind of wadding was found on the pathway between the house and the flower garden north of the house. The siding on the north side of the house near the northeast corner had two injured places in the wood. They appeared like some objects had struck the wood and glanced off breaking the paint and surface of the siding to a depth of about one-eighth inch. The

higher one was about a foot from the east end of the
north side and up about 6 feet from the ground. The
lower one was about a foot further towards the west
and about 2 feet lower. The location where the shell
casing was found, the place furthest north where wad-
ding was located, and the places where the north wall
were injured were substantially in a line from north-
west to southeast but more easterly than southerly.
There was evidence that defendant had purchased a
12-gauge shotgun in the fall of 1950 and that he had
it as late as April of 1952. There was no direct proof
that he had a 12-gauge shotgun the night of June 20,
1952.

The defendant was at the Union Pacific depot in Har-
din, Colorado, a village about 16 miles east of Greeley,
Colorado, about 6:30 a. m. on June 23, 1952. He inquired
of the custodian of the depot for information of trains
going to Kansas City. He said his wife had been in an
automobile accident in that city and he wanted to go
and get her. The custodian could not sell tickets but
he made a call to another station with the request that
the train stop at Hardin. Defendant was arrested on
the afternoon of that day by the sheriff of Weld County,
Colorado, and two members of the Colorado Courtesy
Patrol. When they located him they "covered" him.
He said to them " 'You don't need to cover me,' * * * 'I
haven't got any gun, and I know what you want me
for.' " The sheriff asked him " 'What do you know that
we want you for,' " and he replied " 'You want me for
murder.' " The officers searched the automobile of de-
fendant but did not find a gun of any kind. The license
plates of the car had been removed from it. Defendant
told the sheriff he had a part of a cabin camp register
in his grip and it would explain everything. The sheriff
inquired if the defendant would sign a waiver of extra-
dition and he answered " 'I will be very glad to, be-
cause I want to get back and get this over with.' " The
sheriff asked him " 'What did you do with the gun,' "

and he said " 'That's for you to find out.' "

The evidence on behalf of defendant was as follows: He drove his automobile through Sidney on the afternoon of June 20, 1952, on a trip from Ogallala to Brownson. He ate at the Brownson steak house and tavern. He was seen by an acquaintance there at about 4:30 p. m. This acquaintance corroborated the statement of defendant. The defendant then went to Potter. Brownson is about 6 miles west of Sidney and Potter is about 10 miles west of Brownson. Defendant had been doing steel work and roughnecking in the oil fields for several months. He was looking for work of this kind. He met and talked at Potter with an employee of Lohman and Johnson, oil drillers; about jobs where the longest locations were and about how long it takes to drill a well. About dark that evening he left Potter to go back to Brownson. He was driving a 1939 Ford sedan, and he had a 16-gauge Davenport single shot shotgun and a .22 single shot Winchester rifle in the back of his car. He went to Brownson, stopped a few minutes, made a purchase, and then drove south and west about 18 miles across the hills to the Lohman and Johnson well. He talked with the driller and other men there for about an hour. He was trying to get a job there because they were paying more money than anyone else. He then drove a short distance to the northeast to Cy Herndon's. He stayed there 2 or 3 hours. When he left he drove out north to the road and remained in his car there that night. He was not in Sidney on the night of June 20, 1952, or at any time that day after he drove through the city on the afternoon on his way to Brownson. He did not shoot his wife. He did not own or have in his possession a 12-gauge shotgun. The 12-gauge shotgun he owned in the fall of 1950 he sold in the early part of January 1952, at Lyons, Kansas, to an oil field worker. He had not owned and had not had in his possession a 12-gauge shotgun at any time since January 1952. The next morning he

started for Kimball, ran out of gas about 4 miles west and 8 miles south of Potter, walked to a farm house, succeeded in buying gasoline, and then drove west. He turned on the car radio and heard a broadcast to the effect that he was wanted by the Sidney police for murder. The radio broadcast gave a description of him, his car, and his dog. A short time later he took his dog to a washout, shot him, wrapped him in a blanket, and left him there. This was Saturday forenoon June 21, 1952. He drove around in the hills until the morning of June 23, when he went into Hardin, Colorado. He stopped that morning, and cleaned up by a creek under a bridge. He changed clothes and left some of his clothes and other belongings, including insurance papers, in a suitcase and an air force duffle bag under the bridge. He had stayed in his car out in the hills at night, slept in his car, and did not eat any place. He stopped at the depot at Hardin, Colorado, about 8 a. m., June 23, 1952, and asked about a ticket to Kansas City. He wanted to go there so that he could get to Marion, Kansas, and see a lawyer he knew. He later talked with him from the office of the sheriff in Sidney. While in Hardin he was arrested and returned to Sidney.

The dog and guns of defendant were found at the location where he said he left them after he heard he was wanted for murder. A No. 12 shell casing would not fit and could not be inserted in the 16-gauge shotgun of the defendant, the only one he owned or had possession or use of at the time the deceased was shot.

The defendant denied that there had been any serious disagreement between him and his wife; that he had been unkind to her; or that he had ever threatened to do her physical harm. He denied the statement in the testimony of Dallas Stephenson of Gering that he had said that he was discouraged and was going to sell everything he had and that he indicated to Stephenson that there had been some kind of trouble concerning his wife. He denied that he had injured his wife on either June 4 or

when they were on the trip to or from Sedgwick, Colorado. He denied each of the statements testified to by Mrs. Pingel as having been made by defendant when he and his wife were at her home on June 4, 1952, and defendant denied the statements attributed to him by the sheriff of Weld County, Colorado, at and about the time he was arrested.

The defendant claims error of the trial court prejudicial to him in the ruling made during the cross-examination of a witness produced by the State prohibiting inquiry by defendant in reference to a collateral matter for the declared purpose of attempting to establish a foundation for impeachment of the witness. The subject of the cross-examination attempted by counsel for the defendant, as indicated by the inquiry made, was whether or not the witness and her husband had at any time previous had marital difficulties or unpleasantness. The subject was not introduced by anything asked or by any answer or statement during the direct testimony of the witness. It is abundantly clear that if the defendant in presenting evidence of his defense during the trial had called this witness he could not properly have examined her as to any marital difficulties between her and her husband in support of his plea of not guilty. This is the basis for determining that a fact is or is not collateral. The test of whether a fact inquired of in cross-examination is collateral is, would the cross-examining party be entitled to prove it as a part of his case tending to establish his plea. Ferguson v. State, 72 Neb. 350, 100 N. W. 800; Owens v. Omaha & C. B. St. Ry. Co., 99 Neb. 364, 156 N. W. 661; Vanderpool v. State, 115 Neb. 94, 211 N. W. 605. The declared purpose of this examination could not have been served by the proposed inquiry because the subject being collateral the defendant would have been conclusively bound by the answer of the witness to his inquiry. He could not have been permitted to attempt to prove the untruth of her answer. If a witness is cross-

examined on a matter collateral to the issue he cannot as to his answer be subsequently contradicted by the party putting the question. Latham v. State, 152 Neb. 113, 40 N. W. 2d 522. The trial court in this instance strictly observed and properly applied the rule of practice that a party should not be permitted to cross-examine a witness as to a matter foreign to the scope of his direct examination. If he desires to inquire of him as to other matters he must make the witness his own, calling him in the subsequent progress of the case. The rule of strict cross-examination has been adopted and is in force in this state. The ruling of the trial court in regard to the scope of cross-examination will be sustained unless it is an abuse of discretion. Brooks v. Thayer County, 126 Neb. 610, 254 N. W. 413; Owens v. Omaha & C. B. St. Ry. Co., *supra;* Goemann v. State, 100 Neb. 772, 161 N. W. 421; Manley State Bank v. Spangler, 130 Neb. 196, 264 N. W. 459. The challenge of the judgment in this regard is without merit.

The defendant in his direct testimony mentioned no fact or matter in which he was in any way concerned, except his name, age, the name of his wife, and the period of their marriage, that happened or existed before June 20, 1952. That was the day of the tragedy responsible for this case. The State on cross-examination of defendant was permitted to examine him as to his whereabouts, activities, and conversations during a period of time prior to anything mentioned in his direct testimony. The length of the period is not definitely fixed by the record but it was at least 2 weeks and probably longer. The cross-examination involved his presence and conduct in Sedgwick, Colorado, and a business transaction there, the place where he stayed in Scottsbluff while he was employed there, how long he was there, and other business transactions in that locality. It was developed in the cross-examination that he had sold 3 items of personal property to a man in Gering. Defendant was then asked if it was not a fact that he told the purchaser

that he and his wife were splitting up and he wanted to sell everything he had. He denied this. Defendant also at this time sold some small rocks, a rock-polishing gadget, and a book of instruction on polishing rocks to another person. He was asked in this cross-examination if he had not told the purchaser that he and his wife had worked on the rocks and when he looked at them it made him think of her and because of this he wanted to get them out of sight. He denied it.

The purchaser who lived in Gering was produced as a witness in rebuttal and was permitted to testify that the defendant told him at the time of the transaction that "he had some stuff he wanted to sell, he was kind of discouraged and going to sell everything he had," and that "He indicated there had been some kind of trouble in the family concerning his wife." The whole of the cross-examination referred to and described above should have been excluded. However it may not be considered prejudicial to the defendant because of absence of timely and sufficient objections and also because at the time of the examination complained of there had been reviewed in the record without objection much evidence of the unpleasantness and the failure of the marriage of defendant and his wife and of their separation and strained relations. The well-established rule is that although a witness is permitted to be cross-examined as to matters not brought out on direct examination, the judgment will not be reversed when it appears that no prejudice could have resulted. Brooks v. Thayer County, *supra;* Manley State Bank v. Spangler, *supra.*

The defendant bases a contention of prejudicial error at the trial on the fact that two witnesses were called by the State and gave rebuttal testimony without their names being endorsed on the information. It has long been the rule in this state that the requirement that the names of the witnesses for the state must be endorsed upon the information has no application to rebut-

tal witnesses. In Ossenkop v. State, 86 Neb. 539, 126 N. W. 72, the rule is stated: "In a criminal prosecution, rebuttal testimony on behalf of the state may be given by witnesses whose names were not endorsed on the information." See, also, Clements v. State, 80 Neb. 313, 114 N. W. 271; Kelly v. State, 51 Neb. 572, 71 N. W. 299.

The jury after it had deliberated in this case for about 5 hours sent to the court a question concerning the eligibility for parole of a person condemned to life imprisonment. The jury was returned to the court-room and the court gave it in writing an instruction. The jury again retired and less than an hour thereafter returned the verdict in this case. Defendant asserts that the giving of the instruction was prejudicial error. The inquiry made by the jury to the court was whether a person sentenced to life imprisonment for first degree murder was eligible for parole and if so after what length of time. The instruction given by the court in response thereto was that if the jury found the defendant guilty of murder in the first degree it was required under the evidence and the instructions to fix the penalty; that the eligibility for parole or other clemency is determined by the State Board of Pardons when it sees fit to act in reference thereto; and that the jury was not permitted to decide whether such power may or may not be exercised or to control the time or manner of such exercise.

The substance of this was that the court answered the inquiries of the jury by informing it that a convicted criminal sentenced to life imprisonment might be eligible for parole or other clemency if and when determined by the State Board of Pardons, and that the jury had nothing to do in that regard. There was no legal inaccuracy in what the court advised the jury. § 29-2604, R. R. S. 1943. The jury had to make a choice, when it found the defendant had committed first degree murder, between a recommendation of sentence of life imprisonment and punishment by death. § 28-401, R. R. S. 1943. It sought the aid of the court by proper means

for information on a subject concerning which it was not advised. The court could, in the exercise of judicial discretion, have refused to reply to the appeal of the jury for information on the subject of its inquiries. The court elected in the exercise of that discretion to advise the jury the applicable law. It cannot under the circumstances of this case be said the court abused its discretion. In Dinsmore v. State, 61 Neb. 418, 85 N. W. 445, this court said: "Questions of mercy are not for the jury, but for the executive, in the exercise of the pardoning power, and it is not erroneous to so instruct the jury in a prosecution for murder."

Recently in Sundahl v. State, 154 Neb. 550, 48 N. W. 2d 689, that case was considered and the court said: "We are mindful that in Dinsmore v. State, 61 Neb. 418, 85 N. W. 445, the court gave an instruction in which several matters were discussed and, among others, stated that they had nothing to do with questions of mercy, and that that was a power vested in the executive department in the exercise of its authority to pardon. Objection was there made that the instruction invaded the province of the jury. We there held that it did not and that it was a cautionary instruction which the trial court may, in its discretion, give or not." It is also said in that case: "Pardon or parole relates to something that may happen after conviction and to action by the executive department. * * * The jury's duty in a case involving murder in the first degree is to determine the question of guilt or innocence and, if it finds a verdict of guilty, then to fix the penalty at either death or imprisonment for life. That decision should not rest upon whether parole is easy or difficult to secure."

In Liska v. State, 115 Ohio St. 283, 152 N. E. 667, among the forms of verdict given to the jury was one for a verdict of guilty of murder in the first degree with recommendation of mercy. The jury had considered the case for a very long time and then inquired of the court making reference to the form of verdict of guilty with

recommendation of mercy as follows: " 'We would like to have you inform us if there is any hope of pardon if that verdict is brought in.' " In approving the action of the trial court in giving the information requested the court said: "The trial judge told the jury the pardon board could not recommend a pardon for one convicted of murder in the first degree, except on evidence showing innocence beyond a reasonable doubt, and then also said to the jury that the Governor could pardon, if so disposed, at any time. Council for Liska insists that 'this was prejudicial error of the most glaring kind.' We cannot agree with counsel on this. The recommendation of mercy rests wholly in the sound discretion of the jury. They may extend or withhold as they see fit. The trial court might have declined to answer the question asked by the jury, but he did answer, and then told the jury it was not an issue in the case, and that it was not a thing for the jury to speculate upon."

In State v. Carroll, 52 Wyo. 29, 69 P. 2d 542, the jury during its deliberations inquired of the court whether or not where a penalty of life imprisonment was imposed it could be reduced by parole, commutation of sentence, or pardon. The court informed the jury that it could be by the Board of Pardons and Paroles and that that was a matter in the discretion of the board as to the time and the manner of the action which the board might take. The court in deciding a claim of error because of this said: "A statement of trial court in response to inquiry by jury whether pardons or commutations of sentences or paroles could reduce penalty of life imprisonment, that Board of Pardons and Paroles could exercise its discretion at any time after conviction, was not prejudicial to accused who was convicted of murder in first degree with death penalty, statement being fair, extremely limited in scope, and not suggesting in the least what jury should or should not do * * *."

In State v. Buttry, 199 Wash. 228, 90 P. 2d 1026, the court commented that it was recognized in some jurisdic-

tions that whether the defendant can be pardoned if given a life sentence is an element to be considered by the jury in determining whether sentence of death or life imprisonment be imposed and the court also said: "In jurisdictions where a verdict of guilty in the first degree results automatically in sentence of death, unless the jury specifically recommends imprisonment for life, it is quite common for juries to come back into court and ask for an instruction as to whether, if the life sentence be recommended, the defendant can afterwards be pardoned or paroled. An instruction that he can be pardoned and paroled, given under such circumstances, is held not to be prejudicial."

The defendant complains that "the cloak of immunity" was placed around the State but the defendant "was afforded no protection" at the trial; that "forcing him to testify against himself as he was forced to do on cross-examination" is "a shock to the conscience of our courts"; and that the verdict was the result of passion and prejudice and was arrived at in disregard of the evidence and the law. The record has been carefully and completely examined. This investigation has failed to disclose any support of these assertions. The defendant has made no specific reference to any question, answer, objection and ruling of the court, or other matter in the record that in the slightest affords any basis for the contention that he was forced to testify to anything against himself or otherwise or that the trial was improperly conducted. The record shows that the trial was well directed in a dignified ethical manner with due regard for the best traditions of judicial investigations for the truth. There was no authority that could have forced defendant to have testified to anything at the trial. The Constitution was his guarantee and protection against that until he renounced it by voluntarily constituting himself a witness in support of his plea in the case. When he did that it was irrevocable. He could not alternatively disregard and restore immunity as he

decided his self-interest demanded or would best be benefited. A defendant in a criminal case who becomes a witness, subjects himself to the rules applicable to other witnesses. Latham v. State, *supra*. The objection that the verdict was produced by passion and prejudice in disregard of the evidence and the law is not evidenced by anything in the record and rests wholly on unsupported assertions.

The direct evidence of identification of defendant as the person armed with the shotgun waiting in the darkness of the night near the entrance of the home of the deceased when she returned shortly before she was shot was in the testimony of Catherine Hatcher. It is said that what she testified to was inconsistent with and was denied by the physical facts, and that if the events took place as she told them the deceased would of necessity have been shot in the back. The conclusion is deduced from this that the jury disregarded the evidence and that the court should have sustained the motion for a verdict for defendant or should have granted a motion for new trial. This witness was not present when the shot was fired. Neither did she attempt to describe the location of the principals at that time. She was fleeing from the scene, and when she heard a shot she was running south on the walk east of the premises on the way to her home across the intersection southeast of the Frerichs home. There is no direct evidence of the location, position, or conduct of the defendant or the deceased when the fatal shot was fired or what either of them did immediately thereafter until the deceased fell in death prostrate on the lawn. There is an absence in the record of direct proof that the deceased was killed by a shot from a 12-gauge shotgun or that she was not injured by a shot from a 16-gauge shotgun. There was no available, direct proof of any of these things. Neither was it indispensable that there should be. The testimony of Mrs. Hatcher was not inconsistent with or denied by any known physical fact. There is ample evidence from

which the jury could find that defendant feloniously, purposely, and of his deliberate and premeditated malice shot and killed the deceased as charged by the State. It is true that the evidence is conflicting but the duty and responsibility of resolving conflicts in the evidence in this case is not committed to this court. The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case and the conclusion of the jury may not be disturbed by this court unless it is clearly wrong. Franz v. State, 156 Neb. 587, 57 N. W. 2d 139; Danielson v. State, 155 Neb. 890, 54 N. W. 2d 56; Fisher v. State, 154 Neb. 166, 47 N. W. 2d 349; Haffke v. State, 149 Neb. 83, 30 N. W. 2d 462. The evidence in this case does not permit a conclusion that a verdict of the jury is without proof to sustain it.

The record of this case has been, as the gravity of the charge and the seriousness of the result of the trial justifies and requires, carefully and meticulously searched to ascertain and make certain that defendant has not been deprived of or prejudiced in any right or protection that the law guaranteed to him. The result of this is an unqualified conviction that no injustice has been done to defendant. The sentence and judgment of the district court should be and each is affirmed. It should be and is adjudged that the sentence and judgment of the district court for Cheyenne County rendered and entered in this case be executed on Friday, October 16, 1953.

AFFIRMED.