338 P.2d 301

**STATE of New Mexico, Plaintiff-Appellee.**

v.

**David Cooper NELSON, Defendant-Appellant.**

**No. 6462.**

Supreme Court of New Mexico.

March 4, 1959.

Rehearing Denied May 14, 1959.

Joseph B. Zucht, Richard C. Losh, Albu-
querque, for appellant.

Fred M. Standley, Atty. Gen., Fred M. Calkins, Jr., Asst. Atty. Gen., Hilton A. Dickson, Jr., Asst. Atty. Gen., for appellee.

COMPTON, Justice.

Appellant, David Cooper Nelson, was charged with having murdered Ralph Henderson Rainey, and following a trial therefor, the jury returned a verdict of guilty without specifying life imprisonment in lieu of death. Thereupon, appellant was sentenced to death. Motions to set aside the verdict and for a new trial being denied, he prosecutes this appeal.

█ The case is before us a second time with a like verdict. On the former appeal, State v. Nelson, 63 N.M. 428, 321 P.2d 202, we reversed because we entertained serious doubts as to the voluntariness of his confession admitted in evidence. On this appeal we review the undisputed evidence.

Rainey, then living in California, called Jack Rainey, his son, and stated that he intended to leave his home in California on January 8, 1956, heading for Arvada, Colorado, and expected to arrive in Arvada on January 10, 1956. On January 10, 1956, State Patrolman Edgar C. Bell found the body of a man in an arroyo some 14 feet deep and about 3 feet north of the roadbed of Highway 66 in Valencia County, New Mexico, at a point about 15 miles west of Correo. The head was badly "smashed in" and just above the right temple there was a small round hole in the skull. There was blood all over the man's face and neck and the rocks in the immediate vicinity of his head were splattered with what was thought to be blood.

An inquest was held and the body was later identified by Jack Rainey and his brother as that of their father, Ralph Henderson Rainey. An autopsy was performed by Dr. Harold Beighley at 8:30 P.M. January 10, 1956. Two holes were found on the right side of the head and also a hole in the left side. A bullet and two small portions of metal were found inside the deceased's head. The doctor stated that the cause of death was gunshot wounds in the head and that the deceased had been dead for some 12 to 48 hours.

The witness Noel Adams testified that on January 8, 1956, he picked up the appellant at Needles, California, and drove him to Kingman, Arizona, and that appellant told him at the time that he was headed for Albuquerque, New Mexico. This witness stated that as he was driving east out of Kingman the next morning, January 9, 1956, he saw appellant standing alongside the highway.

Thereafter on the night of January 10, 1956, appellant appeared at the home of June Patrick in Kimberly, Nevada, and asked her husband for gasoline money, stating he was driving a friend's car. Appellant then left certain items of personal property

at the Patrick home, which were later identified as belonging to the deceased.

The witness Grygierczyk testified that on January 13, 1956, he picked up the appellant on the highway between Knowls and Low, Utah. On January 16, 1956, Grygierczyk was contacted by John Helfrich, an agent of the Federal Bureau of Investigation, in connection with an abandoned automobile found in a gully some 100 to 300 yards from the side of the Knowls-Low road. Grygierczyk testified that the point at which this car was discovered was only a short distance from the spot where he had picked up the appellant some three days previously. The abandoned car was a 1955 Pontiac and was viewed in the location where it was discovered by Sheriff Fay Gillette of Tooele County, Utah, by the Agent John Helfrich and by the witness Grygierczyk. The car bore no license plates but it was identified as having belonged to Rainey. The license plates were found hidden nearby.

The right front seat of the car was badly stained, and there was a hole in the back of the seat. Numerous items found in the car were subsequently identified as belonging to the deceased. A kleenex box found in the car was sent to the Federal Bureau of Investigation Laboratory in Washington, D. C., for fingerprint checks. The analysis revealed that the box contained the fingerprints of appellant.

The witness, William O'Reilly, Chief of Detectives, Sheriff's Office, Las Vegas, Nevada, testified that on January 25, 1956, he recovered a 38-Caliber Colt Revolver from the home of Arthur Valde in Las Vegas, Nevada. Appellant had left the revolver with Valde two days previously. A firearms expert testified that the gun found in the Valde home could have been the one used to kill the deceased. Also found in the Valde home was a pair of black oxford shoes which appellant had left there, and which were subsequently identified by Rainey's widow as belonging to the deceased.

Further, on January 23, 1956, appellant was arrested for reckless driving in North Las Vegas, Nevada, and the arresting officer testified that appellant had tried to bribe him, and failing in this, broke arrest and fled in a Buick car which he was driving. In attempting to escape, appellant wrecked the Buick and fled on foot into the desert. A brown leather bag which the witness Grygierczyk testified appellant had in his possession when he picked him up on January 13, 1956, and which Mrs. Rainey testified belonged to the deceased, was found in the wrecked Buick. Also a box of Rainey's clothing was found in the Buick.

Appellant was rearrested in Caliente, Nevada, the next day, and at that time he stated that he had had a loss of memory as to anything that had occurred prior to

January 22, 1956, but that he did remember that on that day he was walking along the highway east of Santa Rosa, New Mexico, and that he found an abandoned Buick which he drove to Nevada.

█ Appellant's first contention is that the court erred in responding to the jury's inquiry for information relating to the possibility of parole or pardon on a verdict of life imprisonment.

After the court had instructed the jury and it had been out for deliberation for an hour and a half, it returned into court and submitted the following question:

"We, the jury request a ruling as to time on life imprisonment. Can the defendant ever be released from prison or his life term be commuted to a lesser term."

In answer to this inquiry, the court quoted to the jury the constitutional provision relative to the governor's power to pardon and reprieve. The court also quoted the statutory provisions concerning the authority of the Parole Board. After the jury had again retired to continue its deliberations, the defense attorney objected to the court's action. Some thirty-five minutes later the jury returned with a verdict of guilty of murder in the first degree, without a recommendation of life imprisonment in lieu of death.

Appellant urges that the furnishing of such information to the jury, even upon request, was highly prejudicial to him and is reversible error.

█ Generally, the fixing of punishment for one convicted of crime is the function of the trial judge, and the jury is limited to a determination of the guilt or innocence of the accused. However, Section 40-24-10, NMSA, 1953 Comp., provides in part as follows:

"Every person convicted of murder in the first degree shall suffer death unless the jury trying said cause shall specify life imprisonment in the penitentiary in lieu of death; and in case the jury trying the cause shall specify life imprisonment, the judge shall sentence the person convicted to life imprisonment. * * *"

Under this statute the jury is charged with a two-fold duty; to determine the innocence or guilt of the accused, and then to fix the punishment. In the operation of such a procedure, the courts are divided as to the extent to which the jury is to be informed of the possibility that its sentence may in some manner be set aside, changed, or modified by the laws relating to pardons and paroles. See Annotation in 35 A.L.R.2d 769.

After the most serious consideration, it is the opinion of this court that response to such an inquiry by the jury is not error where, as here, the response is fair and

does not indicate what the jury should or should not do.

We strongly doubt that imposed judicial silence in the face of such an inquiry is of much value in safeguarding an accused's interest. The fact that the jury, of its own volition, directed the inquiry to the court indicates that one or more of the jurors had some knowledge of the laws relative to pardon and parole. Such being the case, a refusal to answer would not dispell erroneous notions implanted by a juror with a "little learning" on the subject, and in all probability would leave the jury in confusion and doubt.

Since the jury has the sole responsibility of fixing the penalty for murder in the first degree, it is our feeling that it can more properly perform this portion of its dual obligation if the trial court is permitted to answer such an inquiry fairly and accurately without attempting in any way to influence the decision as to punishment. State v. Carroll, 52 Wyo. 29, 69 P.2d 542; Liska v. State, 115 Ohio St. 283, 152 N.E. 667; People v. Chessman, 38 Cal.2d 166, 238 P.2d 1001; State v. Meyer, 163 Ohio St. 279, 126 N.E.2d 585; State v. Satcher, 124 La. 1015, 50 So. 835; Griffith v. State, 157 Neb. 448, 59 N.W.2d 701.

Appellant's next point is that the trial court was without jurisdiction inasmuch as Section 41–8–1, NMSA, 1953 Comp., is unconstitutional. The section provides:

"All trials of criminal offenses shall be had in the county in which they were committed: Provided, when an offense shall be committed on the boundary of two [2] counties, or within five hundred [500] yards of such boundary, or where the persons committing such offense shall be on one side, and the injury be done on the other side of the boundary, a trial may be had in either of such counties: Provided, further, that if any mortal wound shall be given, or any poison shall be administered, or any means shall be employed in any county by which any human being shall be killed, who shall die thereof in another county, the trial of such offense may be had in either county: Provided, also, that if any such wound or mortal injury shall have been inflicted in another state on any human being, who shall die thereof in this state, a trial for such offense may be had in the county in which the death happened."

Appellant strongly urges that the provision allowing venue in the county of death, even though the mortal wound was inflicted in another county or state, violates Article II, Section 14 of the Constitution of New Mexico which provides that "the accused shall have the right to * * * a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

The rationale of this argument is that the State failed to prove that the mortal wound was inflicted in Valencia County, and hence venue must be predicated on that portion of Section 41–8–1, supra, which provides for venue in the county of death regardless of where the fatal blow was struck. However, if the State satisfactorily proves that the fatal injury was inflicted in Valencia County, then the constitutionality of Section 41–8–1, supra, is not in issue as the trial was held in Valencia County.

■ Venue may be proved by circumstantial evidence. State v. Mares, 27 N.M. 212, 199 P. 111. And when there is nothing in the record to raise an inference to the contrary, slight circumstances are sufficient to prove venue by a preponderance of the evidence. Brooks v. State, 98 Ga. App. 13, 104 S.E.2d 620; see People v. Brock, 21 Cal.App.2d 601, 70 P.2d 210; People v. Smith, 26 Cal.App.2d 189, 79 P.2d 155.

■ Turning to the evidence again, Officer Bell testified as follows:

"The man was lying on his left side in a—in this arroya bed, his head was on a rock, the left part of his head was badly smashed in and just above the right temple there was a small round hole in his skull. There was blood all over the man's face and it had run down his face and around his neck * * *.

"Q. Now could you describe the area around the body there? A. It is a—the arroya bed is covered with rocks and gravel and these rocks in the immediate vicinity of his head were splattered with blood."

Bell further testified that there were three dark marks on the gravel which he believed to be blood grouped in a straight line leading from the edge of the highway blacktop to the edge of the culvert. See People v. Latona, 2 Cal.2d 714, 43 P.2d 260. On cross-examination, Bell did admit that he could not positively identify the spots on the ground as blood since no laboratory analysis was made. Nevertheless, we believe that the finding of the body in Valencia County, together with Bell's testimony, was sufficient to warrant the jury in concluding that the deceased was killed in Valencia County. It follows that appellant was not deprived of any constitutional guaranty.

In Commonwealth v. Knowlton, 265 Mass. 382, 163 N.E. 251, 254, the court stated:

" * * * there was evidence that the body of the deceased was found on the road * * * within the county of Middlesex, and there was no other evidence offered as to where the

homicide was committed. The finding of the body in Middlesex county was sufficient to * * * warrant the jury in concluding that the homicide was committed in that county. * *"

To the same effect is the following statement by the Tennessee court in Reynolds v. State, 199 Tenn. 349, 287 S.W.2d 15, 16:

"In the instant case all the proof shows that the body of deceased here was found in Wilson County. There is no proof to the contrary. We think that there must be a presumption that the crime was committed here, rebuttable in character, that the crime was committed where the body was found when there is no showing to the contrary. * * *"

We agree with the following statement by the court in State v. Mitchell, 3 Utah 2d 70, 278 P.2d 618, 620:

"* * * We would blind ourselves to reason and reality if we were to hold that in every murder by gunshot, it is necessary, by direct proof, to establish exactly where the shot was fired and that positively and uncircumstantially he who fired it must have been identified as having been in the county of trial and at the scene of the killing. * * *"

■■ The next point raised by appellant is that "The Court erred in refusing to grant defendant's motion for directed verdict at the close of State's case for lack of sufficient evidence in support of the 'felony-murder' rule, and the verdict is not supported by the evidence." He urges that in a felony-murder case there must be shown a causal connection between the felony and the homicide. This is undoubtedly true. But he goes further and insists that the evidence must establish the sequence of events, that is, whether the felony preceded the murder, since there might have been a murder with the felony just an afterthought.

■ We cannot accept this theory. If a killing is committed within the *res gestae* of the felony charged, whether the homicide occurred before or after the felony, is not determinative. Garcia v. State, 159 Neb. 571, 68 N.W.2d 151; State v. Fouquette, 67 Nev. 505, 221 P.2d 404; Commonwealth v. Stelma, 327 Pa. 317, 192 A. 906; MacAvoy v. State, 144 Neb. 827, 15 N.W.2d 45; Leiby v. State, Fla., 50 So.2d 529; cf. People v. Hardy, 33 Cal.2d 52, 198 P.2d 865. To hold otherwise would render a felony-murder conviction practically impossible where the evidence is entirely circumstantial at least in a robbery case such as this one.

We have reviewed the voluminous record carefully, not to weigh the evidence but to determine whether there was substantial evidence to support a first degree murder conviction upon the theory that the

412

killing was done in the perpetration of a robbery. We conclude that the verdict was so supported.

Since there was sufficient evidence to warrant a conviction of "felony-murder," the court did not err in refusing to give appellant's requested instruction number 1, which would have instructed the jury that there was no evidence from which it might find the defendant guilty of murder in the perpetration of robbery. Nor did the court err in giving instructions 2, 3, 4, 9, 9a, 10 and 17, defining the elements of murder with malice. The effect of these instructions, if any, was to place an additional burden upon the State.

Instructions 18, 20, 21 and 30 charged the jury as to second degree murder and manslaughter. Appellant urges that the giving of these instructions was error, citing State v. Reed, 39 N.M. 44, 39 P.2d 1005, 102 A.L.R. 995; State v. Welch, 37 N.M. 549, 25 P.2d 211; State v. Hunt, 30 N.M. 273, 231 P. 703. We agree that there was no evidence of second degree murder or voluntary manslaughter but the cases are not applicable. Appellant was convicted of the only degree of crime within the evidence.

It is further contended that the trial court erred in admitting evidence that appellant was arrested in north Las Vegas, Nevada, for reckless driving, and that he attempted to bribe the arresting officer, broke the arrest and fled. Generally proof of other criminal offenses is not admissible in the trial of an accused and it is considered prejudicial error to admit such proof. However, there are numerous purposes for which evidence of other criminal acts may be admitted. State v. Borrego, 52 N.M. 202, 195 P.2d 622; State v. Bassett, 26 N.M. 476, 194 P. 867. While these exceptions to the general rule cannot be stated with categorical precision, People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 62 L.R.A. 193, one such exception is when the evidence as to other criminal acts by the accused is offered to establish identity. State v. Bassett, supra. Another is when such evidence is offered to show an admission by conduct, consciousness of guilt, or that the accused committed the other criminal acts to avoid punishment for the crime for which he is on trial. McCormick on Evidence, p. 330. See People v. Spaulding, 309 Ill. 292, 141 N.E. 196.

We think the evidence as to other criminal acts of the accused which the trial court admitted in this case was relevant to prove identity. In addition, proof that the accused attempted to bribe the officer, and failing in this, then broke arrest and fled, is probative of the fact that he harbored a consciousness of guilt and was seeking to escape trial and punishment for killing the deceased. This appears obvious since he had in his possession numerous items of property belonging to the deceased.

The final question presented is whether appellant was entitled to disqualify Judge Tackett, who had presided at the original trial without objection, from sitting in the new trial of the cause. It is claimed the judge was without jurisdiction to do so since a disqualifying affidavit had been filed against him pursuant to the provisions of Section 21–5–9, 1953 Compilation. Appellant relies on Section 41–15–7, NMSA, 1953 Comp., which provides as follows:

"The district court to which any criminal cause shall be remanded for new trial shall proceed thereon in same manner as if said cause had not been theretofore tried."

In this jurisdiction there is no statutory definition of a new trial. However, the usual definition of a new trial, both common law and statutory, is that it is a re-examination of an issue of fact *in the same court* after a verdict by a jury. Garden City Feeder Co. v. Commissioner of Internal Revenue, 8 Cir., 75 F.2d 804; Dodge v. Bell, 37 Minn. 382, 34 N.W. 739; Warner v. Goding, 91 Fla. 260, 107 So. 406; Carpenter v. Sixth Judicial District Court, 59 Nev. 42, 73 P.2d 1310, 84 P. 2d 489; State v. Keerl, 33 Mont. 501, 85 P. 862. Hence the statutory definition of new trial contained in many of the codes appears to be but a codification of the common law meaning. Wheeling & Lake Erie Ry. Co. v. Richter, 131 Ohio St. 433, 3 N. E.2d 408.

Since a vast majority of judicial pronouncements relative to a new trial state that it is a re-examination of an issue of fact in the same court, we do not feel that the legislature by enacting Section 41–15–7, supra, intended to provide that the trial judge who had presided over the original trial without objection, could be ousted of jurisdiction to retry the case. Nor do we believe that this statutory provision contemplates a new information or indictment, rearrest or a new preliminary hearing. We are of the opinion that Section 41–15–7, supra, simply means that the district court to which any case is remanded for a new trial shall re-examine and retry all issues of fact.

But we will mention one case which tends to support appellant, Keating v. Superior Court, 45 Cal.2d 440, 289 P.2d 209. This case, however, can readily be distinguished. The decision was grounded on the fact that the case was a non-jury trial with the judge as trier of the facts. The judge had stated openly prior to the new trial that the defendant had wilfully sworn falsely and further that he had no confidence whatever in the defendant's integrity or veracity. In such a situation we believe it would be difficult, if not impossible, for the trial judge to make findings of fact favorable to a defendant upon a new trial. If we had such an extreme case before us, we too might well hold that fundamental

414

justice would require the disqualification of the judge.

We conclude that in the absence of any such compelling reasons as were present in the case of Keating v. Superior Court, supra, after a case has been tried, the trial judge cannot be ousted of jurisdiction or power to preside over the new trial.

Finding no error, the judgment must be affirmed. It is so ordered.

LUJAN, C. J., McGHEE and CARMODY, JJ., and J. V. GALLEGOS, D. J., concur.